UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOSEPH LEGRAND,                    )
                                   )
                Plaintiff,         )
                                   )
        v.                         )       No.  4:08CV326 FRB
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
                Defendant.         )

## MEMORANDUM AND ORDER

        This cause is on appeal for review of an adverse ruling
by the Social Security Administration.  All matters pending before
the undersigned United States Magistrate Judge, with consent of the
parties, pursuant to 28 U.S.C. § 636(c).

### I. Procedural History

        On January 30, 2006, plaintiff Joseph Legrand filed an
application for Disability Insurance Benefits (DIB) pursuant to
Title II, 42 U.S.C. §§ 401, et seq., in which he claimed that he
became unable to work on account of his disability on May 1, 2003.
(Tr. 77-82.)   On initial consideration, the Social Security
Administration denied plaintiff's application for benefits.  (Tr.
48, 49-53.)  Upon plaintiff's request, a hearing was held before an
Administrative Law Judge (ALJ) on August 28, 2007.  (Tr. 26-47.)
Plaintiff testified and was represented by counsel.  A vocational
expert also testified at the hearing.  On October 7, 2007, the ALJ
entered a written decision finding that plaintiff had been under a
disability since March 1, 2006, but not before.  Disability

benefits were thus awarded to plaintiff for the period beginning March 1, 2006. (Tr. 14-23.) On January 16, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 2-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on August 28, 2007, plaintiff testified in response to questions posed by the ALJ and counsel.

Plaintiff is fifty-nine years of age. Plaintiff has a bachelor's degree in business administration. (Tr. 28-29.) Plaintiff was in the army in 1971 and 1972 and received an honorable discharge. (Tr. 36.)

Plaintiff testified that he previously had been awarded full disability due to Hodgkin's disease and received benefits from 1972 to 1978. Plaintiff testified that he voluntarily terminated his benefits in 1978 and returned to work. (Tr. 40.) Plaintiff testified that he worked at the Social Security Administration as a claims representative through 1984 and then worked at the Defense Mapping Agency as a contract administrator for five years. (Tr. 40-41.) Plaintiff testified that he had obtained "top secret" security clearance with his government work. Plaintiff testified that he began his own contracting business after leaving government service. (Tr. 41.) Plaintiff testified that he was last employed in 2002 as a self-employed contractor designing and constructing high-end kitchens and bathrooms. Plaintiff testified that he was

engaged in this business for twenty years and had planned to work for two additional years so that he could pay off all of his properties, including his investment properties. (Tr. 29, 42-43, 94.) Plaintiff testified that he had to stop working because he was no longer physically able do the work. (Tr. 30.)

Plaintiff testified that when he stopped working, he was having difficulty with breathing and walking and was ultimately diagnosed with aortic stenosis. Plaintiff testified that his doctor was monitoring the condition. Plaintiff testified that he went in to have surgery in May 2003 for heart valve replacement, but that the surgeon determined to also perform a quadruple bypass inasmuch as plaintiff's arteries were like "cooked spaghetti." (Tr. 30.) Plaintiff testified that he currently sees a cardiologist every quarter and takes the following medications: Plavix, Coreg, Vytorin, calcium replacement, Furosemide, and Klor-Con. (Tr. 33.) Plaintiff testified that he has had difficulty with his memory since heart surgery and that he has to make notes to himself all of the time. Plaintiff testified that he no longer trusts himself. (Tr. 39.)

Plaintiff testified that he also began experiencing hip pain in 2002 and was diagnosed in April 2006 with vascular necrosis. Plaintiff testified that he underwent compression surgery of the right hip in May 2006, but that the entire hip was then replaced in June 2006. Plaintiff testified that his left hip was replaced fourteen weeks later. (Tr. 31.) Plaintiff testified that a blood clot formed in his left leg after this surgery. (Tr.

32.)

Plaintiff testified that he began experiencing neck pain in August 2003 which has worsened. (Tr. 34.) Plaintiff testified that during the previous two and one-half years, he has been receiving trigger point injections every six months but that the recent injection did not work. Plaintiff testified that he had seen a neurosurgeon for the condition and underwent an MRI the previous week. Plaintiff testified that the MRI showed narrowing between vertebrae 3 and 4. Plaintiff testified that he was scheduled to undergo a bone scan the following day. (Tr. 35.)

Plaintiff testified that he was diagnosed with diabetes in early 2006 and currently took insulin injections. (Tr. 33.) Plaintiff testified that he has also taken thyroid replacement medication since his early years of Hodgkin's disease, and that the medication controls the thyroid condition. Plaintiff also testified that he has high blood pressure which is controlled by medication. (Tr. 34.) Plaintiff testified that he underwent eye surgery in March 2007 because he was tired of messing around with glasses. (Tr. 31.) Plaintiff testified that he has also been diagnosed with cataracts. (Tr. 32.)

As to his daily activities, plaintiff testified that he wakes up in the morning between 7:30 and 8:30 a.m. Plaintiff testified that he does not engage in much activity except for doctor visits. Plaintiff testified that he usually has three or four doctor appointments each month. (Tr. 37.) Plaintiff testified that he is able to attend to his personal care, but with

difficulty. Plaintiff testified that a woman takes care of his feet because of his diabetes. (Tr. 37-38.) Plaintiff testified that he does not engage in any household cleaning and that he has a cleaning woman for such work. Plaintiff testified that he does his own laundry but does not lift more than ten pounds when doing so. Plaintiff testified that he has hired someone to care for his lawn and gardening because he can no longer perform the work. Plaintiff testified that he does not perform any home maintenance. (Tr. 38.)

Plaintiff testified that his only hobby is scuba diving. (Tr. 39.) Plaintiff testified that he tries to go scuba diving twice a year and dives approximately ten times each trip. (Tr. 36.) Plaintiff testified that in July 2005 he went scuba diving in Belize. Plaintiff testified that he became active in scuba diving in 1991 and continues to go when he is physically able. Plaintiff testified that scuba diving is easy to do because there is no pressure and it does not involve physical exertion. (Tr. 30-31, 36-37.)

B. <u>Testimony of Vocational Expert</u>

Jeff Magrowski, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

The ALJ asked Mr. Magrowski to assume a person fifty-five years of age with sixteen years' education. The ALJ asked Mr. Magrowski to further assume the individual to be able to

> lift and carry up to 50 pounds occasionally,
> 25 frequently, stand or walk for six hours out
> of eight, sit for six hours out of eight. Can

- 5 -

> occasionally climb stairs and ramps, never
> ropes, ladders and scaffolds. Pushing and
> pulling with the legs is limited to no
> repetitive and should avoid concentrated
> exposure to hazards of unprotected heights.

(Tr. 43-44.)

Mr. Magrowski testified that such a person could perform work as a building contractor inasmuch as such work was light and skilled. Mr. Magrowski testified that such a person could not perform plaintiff's past relevant work inasmuch as such work involved construction work in addition to contracting. (Tr. 44.)

The ALJ then asked Mr. Magrowski to assume an individual with the same background and to further assume that he "[c]an sit for four hours, stand or walk for an hour and a half. . . . Can occasionally lift 25 pounds, frequently five. . . . Can carry 20 pounds occasionally, ten frequently. Can occasionally reach above his head. Can occasionally be exposed to odors and dust." (Tr. 45.) Mr. Magrowski testified that such a person could not perform plaintiff's past relevant work or any other full time work in the national or state economy. (Tr. 45.)

Plaintiff's counsel then asked Mr. Magrowski to assume an individual of the same age, education and relevant work experience as plaintiff, and to further assume the individual to be "limited to one hour sitting and 15 minutes of standing or walking, and occasionally lifting five pounds but never lifting ten pounds or more, and occasionally carrying ten pounds but never carrying 20 pounds or more." (Tr. 45-46.) Mr. Magrowski testified that, without the ability to alternate between sitting and standing

throughout a full work day, such a person could not perform any full time work. (Tr. 46.)

Finally, plaintiff's counsel asked Mr. Magrowski to assume an individual with the same education and relevant work experience as plaintiff, and to further assume the individual to be unable to "ambulate or walk fifty feet without stopping to rest due to severe, and to a severe arthritic neurological or orthopedic condition[.] [sic]" (Tr. 46.) Mr. Magrowski responded that such a person could not perform plaintiff's past relevant work or any other work in the national or local economies. (Tr. 46.)

## III. Medical Records

Plaintiff visited Dr. Scott A. Kirchner on August 26, 1997, who noted plaintiff's diagnosed coronary artery disease. It was noted that plaintiff was status post myocardial infarction and status post stent placement. Plaintiff's diagnosed conditions of hypothyroidism, gastroesophageal reflux disease (GERD) and history of Hodgkin's disease were also noted. (Tr. 721.)

On January 25, 2002, Dr. Kirchner noted plaintiff's medications to include aspirin, Toprol,[1] Altace,[2] Lipitor,[3] and

---

[1]Toprol is used to treat high blood pressure, to prevent angina and to treat heart attacks. Medline Plus (last revised Feb. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html>.

[2]Altace is used to treat high blood pressure and to reduce the risk of heart attack and stroke. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692027.html>.

[3]Lipitor is used to decrease the amount of cholesterol in the blood and to reduce the risk of heart attack and stroke. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/

Prilosec.[4]  (Tr. 722.)

         Plaintiff visited Dr. Bassam Al-Joundi at Gateway
Cardiology on February 7, 2002, for consultation regarding his
history of coronary artery disease.  It was noted that plaintiff
currently was not experiencing any significant symptoms but that he
was planning to "proceed with significant activity and a trip to
Tahiti for scuba diving."  Dr. Al-Joundi noted plaintiff's medical
history to include Hodgkin's disease, in remission; coronary artery
disease, status post myocardial infarction in 1993; mild to
moderate aortic stenosis/aortic insufficiency; and hyperlipidemia.
Plaintiff's current medications were noted to include Toprol,
Plavix,[5] aspirin, Imdur,[6] and Lipitor.  Upon examination, Dr. Al-
Joundi opined that plaintiff had a significant amount of ischemia,
and noted plaintiff's symptoms to improve only after he was
maximized on medical treatment.  Dr. Al-Joundi expressed concern
that plaintiff's plan to travel to Tahiti for scuba diving
"obviously carries a significant risk of triggering ischemic events
with significant activity."  Dr. Al-Joundi determined for plaintiff

medlineplus/druginfo/meds/a600045.html>.

    [4]Prilosec (Omeprazole) is used to treat GERD.  Medline Plus
(last revised Feb. 1, 2009)<http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a693050.html>.

    [5]Plavix is used to prevent strokes and heart attacks in
patients at risk for these problems.  Medline Plus (last reviewed
Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/
a601040.html>.

    [6]Imdur (Isosorbide) is used to prevent or treat chest pain.
Medline Plus (last reviewed Sept. 1, 2008)<http://
www.nlm.nih.gov/medlineplus/druginfo/meds/a682348.html>.

to undergo cardiac catheterization and possible re-vascularization. In the meanwhile, it was determined that plaintiff would continue on maximum medical management.  (Tr. 575-76.)

On February 27, 2002, plaintiff visited Dr. Al-Joundi and complained of chest pain and heaviness.  (Tr. 573-74.) Nuclear imaging studies performed that same date showed fixed inferior defect, reversible septal defect, moderate inferoseptal hypokinesis, and mildly decreased left ventricular function.  (Tr. 592.)  Dr. Al-Joundi determined to refer plaintiff for cardiac catheterization and most probably intravascular brachy-therapy.  It was also noted that if plaintiff continued to experience a recurrence of symptoms, coronary bypass surgery would be the other option.  (Tr. 573-74.)

Plaintiff visited Dr. Al-Joundi on April 11, 2002, and complained of recurrent symptoms of chest heaviness and shortness of breath within the previous one to two weeks.  Dr. Al-Joundi noted that plaintiff was becoming anxious.  (Tr. 571-72.)  Nuclear imaging studies performed that same date showed moderate fixed inferoseptal defect.  (Tr. 590.)  Dr. Al-Joundi noted that testing showed plaintiff not to be a candidate for intravascular brachy-therapy.  Dr. Al-Joundi opined that plaintiff was doing well and had only atypical symptoms, and questioned whether some of plaintiff's symptoms may be related to his anxiety inasmuch as the testing revealed no significant ischemia.  Dr. Al-Joundi determined to continue plaintiff with medical management.  (Tr. 571-72.)

Plaintiff visited Dr. Al-Joundi on June 19, 2002, and

complained of chest heaviness, tightness, shortness of breath, and fatigue. Dr. Al-Joundi noted plaintiff to be concerned inasmuch as he was undergoing a planned trip for scuba diving. (Tr. 569.) Nuclear imaging studies performed that same date showed moderate inferior fixed defect with minimal septal ischemia, and mild inferior hypokinesis but with preserved overall left ventricular function. (Tr. 588.) Dr. Al-Joundi noted these results not to be much different from previous testing. Dr. Al-Joundi determined to continue plaintiff with maximization of medical treatment, but cautioned plaintiff that he ran a small risk of cardiovascular complications during scuba diving. Plaintiff indicated understanding. (Tr. 570.)

Nuclear imaging studies performed at Gateway Cardiology on December 26, 2002, showed moderate fixed inferoseptal defect, mild inferoseptal hypokinesis, and left ventricular function at the lower limits of normal. (Tr. 586.)

On April 4, 2003, Dr. Kirchner added Levoxyl[7] to plaintiff's medication regimen. (Tr. 723.)

Plaintiff went to the emergency room at St. Anthony's Hospital on May 28, 2003, with complaints of chest pressure radiating to his neck, nausea, shortness of breath, and dizziness. Plaintiff also complained of progressive dyspnea on exertion within the previous one to two weeks. Cardiac catheterization performed that same date showed moderate left main disease, significant

---

[7]Levoxyl is used to treat hypothyroidism. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html>.

valvular disease, and significant aortic stenosis. Additional testing showed moderate to severe aortic regurgitation. Chest x-rays showed mild pulmonary vascular congestion without evidence of overt failure. Dr. Kirchner determined to transfer plaintiff to Des Peres Hospital with a recommendation that plaintiff undergo aortic valve replacement and coronary artery bypass surgery. (Tr. 341-48.)

Plaintiff was admitted to Des Peres Hospital on May 29, 2003, to undergo quadruple bypass surgery and aortic valve replacement. Plaintiff's pre-operative diagnoses included unstable angina, severe coronary artery disease, critical aortic stenosis, mild left ventricular dysfunction and cardiomegaly, and mild pulmonary vascular congestion. Plaintiff did well post-operatively and was discharged home on June 6, 2003, with arrangements made for home health care. Upon discharge, plaintiff was instructed not to drive, bend, stoop, or lift greater than ten pounds. Plaintiff was instructed to walk six times a day. Plaintiff's discharge medications included aspirin, Coumadin,[8] Capoten,[9] Amiodarone,[10]

---

[8]Coumadin (Warfarin) is used to prevent blood clots from forming or growing larger in the blood and blood vessels. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682277.html>.

[9]Capoten is used to treat high blood pressure and heart failure. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682823.html>.

[10]Amiodarone (Cordarone) is used to treat and prevent certain types of serious, life-threatening ventricular arrhythmias. Medline Plus (last revised Nov. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a687009.html>.

Synthroid,[11] Lasix,[12] potassium, and Darvocet.[13]   Plaintiff was instructed to return to Dr. Gordon C. Knight in two weeks for follow up.  (Tr. 135, 138-48, 151-53.)

Plaintiff visited the Veteran's Administration (VA) Hospital on June 30, 2003, and reported that he had recently been discharged from Des Peres Hospital and was started on many medications.   Plaintiff reported that he could not afford his medication or further treatment.   Dr. Vorachart Auethavekiat determined to refill plaintiff's medications and to start plaintiff on Cordarone.  It was noted that plaintiff's medical record needed to be reviewed.  (Tr. 810-11.)

On July 10, 2003, plaintiff visited Dr. Al-Joundi at Gateway Cardiology.   Dr. Al-Joundi noted plaintiff's current medications to be Lipitor, aspirin, Synthroid, Warfarin, and iron supplements.   It was noted that plaintiff's hypertension appeared to be well controlled, and that plaintiff's hyperlipidemia and hypothyroidism were being treated by internal medicine.   Plaintiff currently complained of mild shortness of breath with exercise and atypical chest pain.   Dr. Al-Joundi determined for plaintiff to

---

[11]Synthroid (Levothyroxine) is used to treat hypothyroidism. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html>.

[12]Lasix is used to reduce the swelling and fluid retention caused by various medical problems, including heart disease. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html>.

[13]Darvocet is used to relieve mild to moderate pain.  Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html>.

undergo a stress test to rule out new ischemia. It was also determined that plaintiff would be started on Coreg[14] which was to be followed by Aldactone.[15] (Tr. 606-07.)

An echocardiogram performed that same date at Gateway Cardiology showed abnormal left ventricular systolic function, mild mitral annulus calcification, moderate posterolateral mitral regurgitation, and mild tricuspid regurgitation. (Tr. 582.) Nuclear imaging studies performed that same date showed moderate-sized, fixed, nontransmural, inferior defect with a small amount of reversibility in the inferoseptal area; and moderate left ventricular systolic dysfunction. Dr. Nizar Assi instructed plaintiff to follow up in six weeks. (Tr. 584.)

Plaintiff returned to Dr. Knight on June 18, 2003, who noted plaintiff to have healed well from surgery. Dr. Knight noted plaintiff to experience trace edema. It was noted that plaintiff planned to enroll in cardiac rehabilitation or at the YMCA. Dr. Knight recommended that plaintiff continue with Altace, potassium, Lasix, Synthroid, Omeprazole, iron, and aspirin and restart Plavix. Dr. Knight noted that Amiodarone could be discontinued in two weeks. Dr. Knight recommended that plaintiff undergo a stress test

---

[14]Coreg (Carvedilol) is used to treat heart failure and high blood pressure, as well as to treat people whose hearts cannot pump blood well as a result of a heart attack. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697042.html>.

[15]Aldactone is used to treat patients with low potassium and with edema caused by various conditions, including heart disease. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682627.html>.

and allow two months for recovery before resuming any scuba diving activity.  (Tr. 132, 136.)

On October 2, 2003, Dr. Kirchner added Diovan[16] to plaintiff's medication regimen.  (Tr. 723.)

Plaintiff visited the VA Hospital on October 6, 2003, for evaluation.  Upon review of plaintiff's medical file, it was noted that plaintiff had been diagnosed in 1971-1972 with Hodgkin's disease and had been treated at that time with radiation therapy. It was noted that plaintiff's Hodgkin's disease was currently in remission.  It was also noted that plaintiff suffered a myocardial infarction ten years prior and was treated medically for the condition.  It was noted that plaintiff underwent balloon angioplasty and had stents placed in October 2001 with additional angioplasty in March 2002.  Plaintiff's recent valve replacement and bypass surgery was noted.  Plaintiff reported that he currently experiences shortness of breath and experiences some shortness of breath when climbing one flight of stairs or walking up inclines.  It was noted that plaintiff regularly exercises on a stationary bicycle and treadmill.  Plaintiff reported that he was unemployed due to his heart disease.  Plaintiff reported that he could currently engage in only light housework and did some shopping and driving. Physical examination was unremarkable.  Upon review of the examination and diagnostic testing, Dr. Amr G. El-Shafei diagnosed plaintiff with coronary artery disease and aortic stenosis controlled by

---

[16]Diovan is used to treat high blood pressure and heart failure.  Medline Plus (last reviewed Sept. 1, 2008)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a697015.html>.

bovine valve replacement, possibly resulting from radiation therapy to the chest for Hodgkin's disease.  (Tr. 805-07.)

Plaintiff underwent further diagnostic testing at the VA Hospital on October 8, 2003, which showed mild mitral and tricuspid regurgitation and mild pulmonic insufficiency.  (Tr. 809-10.)

Plaintiff was admitted to Des Peres Hospital on October 16, 2003, with complaints of dark stools, weakness, lethargy, dizziness, lightheadedness, and increased shortness of breath with activity.  Plaintiff reported that he exercised regularly. Plaintiff's coronary artery disease was noted to be clinically stable.  It was determined that plaintiff experienced a gastrointestinal bleed, but various tests showed no source. Plaintiff was transfused six units of red blood cells and two units of plasma.  The cause of the bleed was unknown.  Plaintiff was discharged on October 17, 2003, with the following medications: Protonix,[17] Carvedilol, Digoxin,[18] Levothyroxine, Zocor,[19] Xanax,[20] and Darvocet.  (Tr. 192-99.)

---

[17]Protonix is used to treat GERD.  Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601246.html>.

[18]Digoxin (Lanoxin) is used to treat heart failure and abnormal heart rhythms.  Medline Plus (last reviewed Sept. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682301.html>.

[19]Zocor (Vytorin, Zetia) is used to reduce the amount of cholesterol and other fatty substances in the blood.  Medline Plus (last reviewed Feb. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html>.

[20]Xanax is used to treat anxiety disorders and panic attacks. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html>.

On January 12, 2004, plaintiff visited Dr. Kirchner and complained of chest discomfort and aching in his neck and shoulders. Plaintiff also complained of pain in his hips when walking on pavement but not while walking on the treadmill. Dr. Kirchner noted there to be no evidence of vascular claudication but questioned the possibility of spinal stenosis. Dr. Kirchner determined to order diagnostic tests of the lumbosacral spine and instructed plaintiff to return in four weeks. (Tr. 740.)

Plaintiff visited Dr. Liwa T. Younis at Gateway Cardiology on January 15, 2004, for evaluation of neck pain and chest pain. Plaintiff reported having had increasing episodes of discomfort within the previous three to four weeks. Plaintiff reported that such episodes usually resolve when he stops his activity and lies down, or sometimes by taking Tylenol or pain medication. Plaintiff reported that although he has noticed a recent increase in his shortness of breath, he has no significant shortness of breath while exercising on his bicycle or treadmill and that he can exercise for twenty minutes on the bicycle. Dr. Younis noted plaintiff's current medications to be Lipitor, Plavix, Synthroid, Coreg, Lanoxin, Aldactone, Diovan, Lasix, and Imdur. An echocardiogram was essentially normal with evidence of mild left ventricular and atrial enlargement, and mild mitral and tricuspid regurgitation. Dr. Younis determined such testing not to show significant changes and opined that plaintiff's current discomfort could be angina pectoris or something musculoskeletal in nature. Dr. Younis diagnosed plaintiff with ischemic cardiomyopathy, but

noted plaintiff to appear to be compensated. Dr. Younis instructed plaintiff to continue with his medications and to use Nitroglycerin. (Tr. 604-605, 613.)

Nuclear imaging studies conducted at Gateway Cardiology on January 15, 2004, showed small to moderate fixed inferior defect, small peri-infarct ischemia, and mildly decreased left ventricular function. (Tr. 614.) Dr. Tammam Al-Joundi recommended that Lasix therapy be withheld and that plaintiff undergo coronary angiography. (Tr. 603.)

On January 29, 2004, plaintiff complained to Dr. Kirchner of ongoing neck ache and that he experienced soreness along the shoulders and trapezius muscles on bad days. Plaintiff also complained of pain in his hips which increased with walking. Plaintiff also complained of recent dizzy spells. Dr. Kirchner noted a recent CT of the lumbar spine to show anterior facet degenerative joint disease at L5-S1 but no evidence of spinal stenosis. Dr. Kirchner diagnosed plaintiff with fibromyalgia and bilateral hip bursitis. Dr. Kirchner administered injections to both hips. (Tr. 739.)

Plaintiff returned to Dr. Kirchner on June 15, 2004, and complained of neck pain which increased with minimal activity. Plaintiff reported that his neck continued to feel sore the next day. A massage of the neck increased the pain. Plaintiff reported there to be no radiculopathy to the upper extremities. Plaintiff also complained of ongoing aching in his hips. Dr. Kirchner diagnosed plaintiff with coronary artery disease, status post

atrial valve replacement, fibromyalgia, GERD, hypothyroidism, and history of hyperlipidemia. Plaintiff was prescribed medication, including Amitriptyline.[21] Films of the cervical spine were ordered. (Tr. 738.) On June 16, Dr. Kirchner noted the cervical spine x-rays to be negative. Dr. Kirchner determined to refer plaintiff to a pain management specialist and instructed plaintiff to increase his dosage of Amitriptyline. (Tr. 738.)

On June 22, 2004, plaintiff visited Dr. Armin Rahimi at South County Anesthesia Pain Clinic upon the request of Dr. Kirchner. Plaintiff reported that he had experienced bilateral hip pain for two years and that it was getting progressively worse. Plaintiff reported that he had been diagnosed with bursitis and that he received steroid injections which provided relief for approximately three weeks. Plaintiff also reported that he had experienced cervical pain since undergoing valve surgery in May 2003. Plaintiff reported his cervical pain to increase with movement and activity and to decrease with rest. Plaintiff reported his bilateral hip pain to increase with walking and to decrease with rest. Dr. Rahimi noted plaintiff's current medications to include Plavix, Coreg, Spironolactone,[22] Isosorbide,

_____

[21]Amitriptyline is used to treat symptoms of depression as well as post-herpetic neuralgia (the burning, stabbing pains, or aches that may last for months or years after a shingles infection). Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html>.

[22]Spironolactone is used to treat patients with low potassium levels and edema caused by various conditions, including heart disease. Medline Plus (last reviewed Sept. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682627.html>.

Digoxin, Diovan, Levoxyl, Lipitor, Prilosec, and Elavil.[23] Physical examination showed muscle strength to be 5/5 in all extremities. Reflexes were 1/4 in all extremities. Cervical range of motion was decreased due to complaints of pain in the posterior cervical paraspinal region. Tenderness was noted to palpation over the posterior cervical paraspinal and upper trapezius musculature. Plaintiff's gait was noted to be within normal limits. Straight leg raising was negative. Limited external rotation was noted about the bilateral thighs. Focal tenderness to palpation was noted over the bilateral trochanteric area. Dr. Rahimi opined that plaintiff's complaint of cervical and upper back pain appeared to be secondary to myofascial etiology. Dr. Rahimi noted that although the examination was consistent with possible trochanteric bursitis, such findings should not cause disabling discomfort. Plaintiff was instructed to engage in more physical activity. Plaintiff was given a trochanteric bursa injection and was referred for physical therapy. Plaintiff was instructed to return in three or four weeks for reevaluation. (Tr. 230-35.)

Plaintiff returned to Dr. Rahimi on July 13, 2004, and reported that he was doing much better. Plaintiff reported that his neck was no longer sore, although he continued to experience discomfort in his lower extremities with ambulation. Plaintiff reported to be very pleased. Physical examination showed no pain with palpation over the cervical paraspinal region. Dr. Rahimi

---

[23]Amitriptyline. Physicians' Desk Reference 626 (55th ed. 2001).

noted plaintiff's myofascial pain to be much improved with physical therapy. Plaintiff was instructed to continue with physical therapy and to return for follow up in three to four weeks. (Tr. 237.)

On August 12, 2004, plaintiff reported to Dr. Rahimi that he was doing much better. Plaintiff reported the pain in his left leg to have resolved, and that the pain in his right leg was minimal. It was noted that plaintiff recently returned from a scuba diving trip and was experiencing some discomfort in his right upper back. Tenderness was noted on palpation over the right trapezius and posterior cervical region. A trigger point injection was recommended, but plaintiff declined. Dr. Rahimi instructed plaintiff to continue with physical therapy and to return for follow up in three to four weeks. (Tr. 238.)

On August 12, 2004, plaintiff visited Dr. Kirchner and reported that his hips were better with physical therapy and that his neck was slightly better. Plaintiff reported that he had decreased his activity level because of weight gain. Dr. Kirchner continued in his diagnoses and adjusted plaintiff's medications. Plaintiff was instructed to return in eight weeks. (Tr. 737.)

Plaintiff returned to Gateway Cardiology on August 30, 2004, and complained of recent dizziness and lightheadedness. It was noted that plaintiff's dizziness improved with an adjustment of medications. Plaintiff denied any chest pains or syncope. It was noted that plaintiff became short of breath with exertion but was not functionally limited thereby. Physical examination was unremarkable. Dr. Nazar Assi noted plaintiff's left ventricular

function to have improved significantly and to have almost normalized. Dr. Assi also noted plaintiff not to have any evidence of heart failure. Plaintiff was instructed to discontinue Aldactone, Digoxin and Imdur. Dr. Assi recommended that plaintiff pursue a cardiovascular exercise program on a regular basis to help improve his symptoms of dyspnea on exertion. Dr. Assi noted that plaintiff appeared to be stable and instructed plaintiff to return in four months. (Tr. 601-02.)

On August 31, 2004, plaintiff reported to Dr. Rahimi that he was experiencing discomfort in the right hip as well as in the cervical and upper shoulder area. It was noted that plaintiff continued to participate in physical therapy. Tenderness to palpation was noted over the bilateral trapezius muscle, associated with palpable spasm. Focal tenderness over the right trochanteric area was also noted. Plaintiff was diagnosed with myofascial pain and right trochanteric bursitis. Plaintiff was administered trigger point injections to the right trochanteric bursa and to the trapezius muscles. Plaintiff was instructed to continue with physical therapy and to return in three to four weeks for follow up. (Tr. 239-42.)

In a report to Dr. Rahimi dated September 22, 2004, Sean Quinn, a physical therapist with SpineCare, Inc., reported that plaintiff had been seen on twenty-three occasions since June 23, 2004, and enjoyed significant progress with trigger point injections and muscle relaxant therapy. It was noted that plaintiff had not taken any muscle relaxers for a period of days and currently

reported his neck pain to be 0/10, left hip pain to be 0/10, and right hip pain to be 3/10.  It was noted that plaintiff reported slight to mild difficulty with ambulation due to right hip pain, but that the pain was alleviated with pressure.  It was also noted that plaintiff reported having decreased difficulty with shortness of breath on the stairs and that he no longer had difficulty trimming bushes since the last round of injections and muscle relaxers. It was noted that plaintiff was excited and pleased with his progress.  (Tr. 272.)  A report of examination showed plaintiff to have limited range of motion with mild restriction of the hamstrings, hip extensors, piriformis, lower trunk, and pectoralis. Pain was elicited with palpation of the cervical paraspinals, bilateral levator scapula, bilateral middle trapezius, bilateral rhomboids, left quadriceps, and bilateral TFL/ITB.  (Tr. 273.)  It was determined that plaintiff could be weaned from physical therapy and progress to an independent workout program, which, it was noted, plaintiff was already beginning to perform.  It was also noted that eleven out of twelve short and long term goals had been met, including the ability to perform gardening activities with slight difficulty, the ability to perform activities of daily living with slight difficulty, the ability to walk two miles for exercise with slight difficulty, and the ability to walk up and down a flight of steps without difficulty in the hips.  (Tr. 274.)

On September 28, 2004, plaintiff returned to Dr. Rahimi and reported that he responded very well to the trigger point injections and had done very well with physical therapy.  Plaintiff

currently complained of mild tenderness in the right upper thigh and cervical region. Physical examination showed focal tenderness in the left cervical paraspinal area, bilateral rhomboid area and bilateral anterior upper thigh area. Plaintiff was diagnosed with myofascial pain, which was noted to have responded well to physical therapy and trigger point injections. Plaintiff was administered trigger point injections to the thoracic paraspinal area, anterior thigh area and cervical paraspinal area and was instructed to continue with home exercises. (Tr. 243-44.)

On October 4, 2004, plaintiff reported to Dr. Kirchner that his neck and hips were now doing well. Plaintiff reported that he works out on the treadmill, stretches, and does resistance training three days a week, and walks the other days. Dr. Kirchner diagnosed plaintiff with myofascial pain syndrome. Plaintiff's medications were adjusted and he was instructed to return in eight weeks. (Tr. 736.)

On October 20, 2004, Dr. Kirchner adjusted plaintiff's medications and instructed him to call upon his return from vacation. (Tr. 736.)

On October 26, 2004, plaintiff returned to Dr. Rahimi and reported that the trigger point injections were very helpful. Plaintiff currently reported having non-radiating pain in the right trochanteric area which increased with prolonged walking. Physical examination showed focal tenderness with palpation over the lateral right thigh in the trochanteric region. Plaintiff was diagnosed with right trochanteric bursitis and an injection was administered

to the right trochanteric bursa. Plaintiff was instructed to continue with his home exercises. (Tr. 245-46.)

On November 29, 2004, plaintiff reported to Dr. Kirchner that he was attempting to lose weight and had been working out at a health club for five weeks on the treadmill and with weights. Physical examination was unremarkable. Dr. Kirchner continued in his diagnoses of plaintiff and adjusted his medications, adding Vytorin to the medication regimen. Dr. Kirchner ordered an echo-cardiogram to be conducted at Gateway Cardiology. (Tr. 723, 735.)

On December 1, 2004, plaintiff reported to Dr. Rahimi that he was doing better with the hip pain. Plaintiff reported having some pain in the cervical area which began two and a half weeks prior. It was noted that plaintiff had been working in the yard. Physical examination showed tenderness with palpation over the bilateral rhomboid trapezius. Plaintiff was diagnosed with myofascial pain and was administered trigger point injections to the upper trapezius and rhomboid muscles. Plaintiff was instructed to continue with his home exercises. (Tr. 247-48.)

An echocardiogram taken at Gateway Cardiology on December 3, 2004, showed severe inferior, inferoseptal and anteroseptal hypokinesis; moderately reduced systolic function; mild left ventricular hypertrophy; moderate mitral regurgitation; mild tricuspid regurgitation; and abnormal right ventricular systolic pressure, consistent with mild pulmonary hypertension. (Tr. 612.)

On January 12, 2005, plaintiff reported to Dr. Kirchner that his current exercise regimen consisted of warming up on the

treadmill and then moving on to the stair-stepper. Plaintiff reported experiencing no palpitations or syncope. Plaintiff reported experiencing transient lightheadedness. Dr. Kirchner questioned whether plaintiff was adequately hydrated. Plaintiff reported that his neck was doing okay with intermittent injections. Dr. Kirchner continued in his diagnoses of plaintiff. (Tr. 734.)

Plaintiff appeared at Gateway Cardiology on January 17, 2005, to undergo nuclear imaging studies for sports clearance. The studies showed fixed nontransmural interior and inferioapical defect with minimal partial reversibility, and mildly decreased left ventricular systolic function. (Tr. 609.)

On February 17, 2005, plaintiff complained to Dr. Kirchner that he had been experiencing dizziness, vertigo and lightheadedness. It was noted that plaintiff continued with his trigger point injections. Plaintiff was instructed to increase his dosage of Levoxyl and to hold off on Spironolactone. Plaintiff was instructed to return in eight weeks. (Tr. 732.)

On February 21, 2005, plaintiff complained to Dr. Rahimi that he has had increased spasming and pain in the cervical and upper back region which began a few weeks prior. It was noted that plaintiff had responded well to trigger point injections. Physical examination showed tightness to palpation over the bilateral posterior cervical region as well as the upper trapezius and rhomboid muscles. Plaintiff was diagnosed with myofascial pain and was administered trigger point injections. Plaintiff was

instructed to take Skelaxin[24] as needed and to continue with home exercises. Dr. Rahimi noted that if plaintiff's condition did not improve, physical therapy would be resumed. (Tr. 249-50.)

On April 4, 2005, plaintiff reported to Dr. Rahimi that he responded very well to the trigger point injections after the last visit and recently began to experience discomfort bilaterally in the upper shoulders and back. Plaintiff reported the pain to be non-radiating and to increase with activity. Plaintiff denied any other complaints. It was noted that plaintiff was less involved with his home exercises. Physical examination showed focal tenderness to palpation over the trapezius and rhomboid areas. Plaintiff was diagnosed with myofascial pain which was noted to respond to trigger point injections. Plaintiff was administered trigger point injections to the trapezius and rhomboid muscles. It was noted that if plaintiff's pain became persistent, plaintiff would be referred back to physical therapy. Plaintiff was instructed to return in three to four weeks. (Tr. 251-52.)

Plaintiff visited Dr. Knight on April 18, 2005, and complained of sternal pain. Plaintiff also wanted an opinion regarding removal of the sternal wire. Physical examination was unremarkable. Dr. Knight noted there to be very thin sternal skin with wire pain. It was determined that the sternal wire would be removed. Plaintiff requested that such procedure be performed

---

[24]Skelaxin is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682010.html>.

before May 7, 2005.  (Tr. 158.)

On April 25, 2005, plaintiff visited Dr. Kirchner.  It was noted that plaintiff had been receiving trigger point injections, was exercising, and that his hip pain had significantly decreased.  Dr. Kirchner continued in his diagnoses, including cervical myofascial pain syndrome.  Plaintiff was instructed to return in three months.  (Tr. 733.)

In a letter to Dr. Kirchner dated April 28, 2005, Dr. Knight reported that plaintiff had complained of sternal wire pain, specifically noting, "As you know, he is a very active man and wishes to have his wires removed because of the tenderness that it [sic] causes."  (Tr. 162.)  The wire removal was performed on an outpatient basis on April 27, 2005, with the removal of five sternal wires.  (Tr. 162, 165-66.)

On May 2, 2005, plaintiff reported to Dr. Tammam Al-Joundi at Gateway Cardiology that he was doing well with no chest discomfort, dyspnea, paroxysmal nocturnal dyspnea, or orthopnea.  Physical examination was unremarkable.  Dr. Al-Joundi noted plaintiff to be asymptomatic with well-controlled blood pressure and no orthostatic symptoms.  Plaintiff was instructed to increase his dosage of Toprol and to return in four months.  (Tr. 599-600.)

Plaintiff followed up with Dr. Knight on May 4, 2005, who noted plaintiff to have no problems and to be healing well.  It was noted that plaintiff was leaving for a two-week vacation and came in early for his follow up visit.  (Tr. 157.)

Plaintiff returned to Dr. Rahimi on July 18, 2005, who

noted plaintiff to have done very well with his trigger point injections for about three to three and one-half months. Plaintiff reported that he was leaving soon to go on a diving trip and that he was remodeling his kitchen. Plaintiff complained of discomfort in the right cervical region and bilateral upper shoulders. Physical examination showed focal tenderness to palpation over the right posterior cervical region and bilateral trapezius and rhomboid areas. Plaintiff was diagnosed with myofascial pain which was noted to respond well to trigger point injections. Plaintiff was administered trigger point injections and was instructed to return in three to four weeks. (Tr. 253-54.)

On August 17, 2005, plaintiff returned to Dr. Kirchner for follow up. Examination was unremarkable and plaintiff was continued in his diagnoses and treatment. (Tr. 731.)

On September 19, 2005, plaintiff returned to Dr. Rahimi and reported a recurrence of pain approximately one week prior. Dr. Rahimi noted plaintiff to have gone on a diving trip to Belize since his last visit in July and to have tolerated the trip without difficulty. Plaintiff reported his current pain to be non-radiating, without weakness, numbness, paraesthesia, or pain in either upper extremity. Plaintiff reported the pain in his cervical and upper shoulder area to increase with movement and activity. Physical examination showed decreased range of motion about the neck with discretely tender points elicited in the right and left paraspinous and trapezius muscle groups. Trigger point injections were administered. (Tr. 255-57.)

On October 19, 2005, plaintiff reported to Dr. Kirchner that he continued to have neck and shoulder trigger point injections with benefit. Plaintiff was continued in his diagnoses and treatment and was instructed to return in ten weeks. (Tr. 729.)

Plaintiff returned to Dr. Rahimi on November 16, 2005, and reported having done well with the previous injections until approximately two or three weeks prior when the pain returned. It was noted that plaintiff was remodeling his kitchen and noticed increased muscular discomfort with increased physical activity. Plaintiff denied any other complaints. Dr. Rahimi noted plaintiff's current medications to include Diovan, Prilosec, Vytorin, Levoxyl, Quinine,[25] Plavix, Toprol, and iron sulfate. Physical examination showed decreased cervical range of motion. Muscle strength was 5/5 in the upper extremities and motor and sensory examination was intact in both arms. Focal tenderness was noted to palpation over the bilateral posterior cervical and upper trapezius muscle, as well as tenderness to palpation over the right rhomboid musculature. Plaintiff was diagnosed with cervical and bilateral upper shoulder myofascial pain and was administered trigger point injections. Plaintiff was instructed to return in two or three weeks for follow up. (Tr. 258-60.)

Plaintiff returned to Dr. Kirchner on December 27, 2005, and reported having had only one night of rest since December 3 due to cough and shortness of breath. It was noted that plaintiff had

---

[25]Quinine is used to treat malaria. <u>Medline Plus</u> (last reviewed Sept. 1, 2008)<<u>http://www.nlm.nih.gov/medlineplus/</u> druginfo/meds/a682322.html>.

gained over twelve pounds since his last visit. Plaintiff reported that he had engaged in no regular exercise. Plaintiff reported his sleep and energy level to be okay. Dr. Kirchner determined for plaintiff to undergo an echocardiogram. (Tr. 728.)

An echocardiogram taken at Gateway Cardiology on December 27, 2005, showed abnormal left ventricular systolic function with mild inferior posterior hypokinesis, left atrial enlargement, mild to moderate mitral regurgitation, mild tricuspid regurgitation, and mild pulmonic insufficiency. (Tr. 608.)

On January 10, 2006, plaintiff reported to Dr. Rahimi that he had responded very well to the previous trigger point injections until recently when muscle tightness and spasm in the cervical and upper back region reoccurred. Plaintiff reported that he finished remodeling his kitchen and was going on a trip to South America over the next few weeks. Physical examination showed decreased cervical range of motion with tenderness to palpation over the bilateral posterocervical, trapezius and rhomboid musculatures. Plaintiff was administered trigger point injections and was instructed to return on an as needed basis. (Tr. 261-63.)

Plaintiff visited the VA Hospital on January 13, 2006, without an appointment. It was noted that plaintiff had not been followed at the VA Hospital for a period of time and that plaintiff had been seeing his private internist. Plaintiff reported that he could no longer afford his medication and was deeply in debt. Physical examination showed muscle wasting over radiated fields. Depression screening yielded negative results. Plaintiff was

diagnosed with Hodgkin's disease with multiple areas of radiation damage. It was determined that plaintiff's medications would be refilled and that plaintiff would be seen at the hospital every four to six months. (Tr. 808-09.)

Nuclear imaging studies performed on January 18, 2006, at Gateway Cardiology showed no significant changes from the previous study. It was noted that plaintiff demonstrated good exercise tolerance. Dr. Younis recommended that plaintiff continue with medical therapy and routine activity. (Tr. 596.)

On February 8, 2006, plaintiff reported to Dr. Kirchner that he lacked motivation and experienced no enjoyment. Plaintiff reported having experienced increased tearfulness for approximately one month and that he did not want to get out of bed. Plaintiff reported that he could not make himself exercise. Plaintiff also complained of experiencing positional vertigo for two to three days. Dr. Kirchner diagnosed plaintiff with active depression and prescribed Cymbalta.[26] Plaintiff was instructed to return in four weeks. (Tr. 699.)

On February 13, 2006, plaintiff visited Dr. Kirchner for complaints of fever, chills and sweats. During this visit, plaintiff reported that he was not tolerating the Cymbalta well. Dr.

---

[26]Cymbalta is used to treat depression and generalized anxiety disorder, as well as pain and tingling caused by diabetic neuropathy and fibromyalgia. Medline Plus (last revised Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html>.

Kirchner changed plaintiff's medication to Paxil,[27] which plaintiff reported on February 14 and 16 that he was tolerating well. (Tr. 698.)

On February 21, 2006, plaintiff reported to Dr. Kirchner that he was less jittery, that his mood was better, and that his energy had increased a bit. (Tr. 700.)

On March 1, 2006, plaintiff reported to Dr. Rahimi that he recently began to experience localized posterior cervical and upper back pain while working in his kitchen. Plaintiff denied any pain or weakness in either upper extremity. Physical examination showed decreased cervical range of motion with tenderness to palpation over the bilateral posterior cervical, trapezius and rhomboid muscles. Plaintiff was administered trigger point injections and was instructed to return in two or three weeks. (Tr. 214-16.)

Plaintiff visited Dr. Kirchner on March 15, 2006, and reported that he had discontinued Paxil three days earlier due to decreased urinary stream. Plaintiff reported that he was feeling better and did not get depressed. Dr. Kirchner determined plaintiff's depression to be in remission and instructed plaintiff to return in four weeks for follow up. (Tr. 701.)

On April 11, 2006, plaintiff reported to Dr. Kirchner that he had experienced night sweats for one month and was experiencing increased depression. Plaintiff also complained of

---

[27]Paxil is used to treat depression, panic disorder and social anxiety disorder. Medline Plus (last reviewed Sept. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html>.

hip and buttock pain with walking.  Dr. Kirchner determined that plaintiff needed an MRI of the lumbar spine and a scan of the lumbosacral spine for the possibility of spinal stenosis.  (Tr. 703.)

Upon review of medical records from Gateway Cardiology, Dr. Rahimi and Dr. Knight, as well as the results of various diagnostic tests, A. Blattel, a medical consultant with disability determinations, completed a Physical Residual Functional Capacity Assessment on April 17, 2006, in which it was opined that plaintiff could occasionally lift fifty pounds and frequently lift twenty-five pounds.  It was further opined that plaintiff could stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and was unlimited in his ability to push or pull with his hands and feet.  It was opined that plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; but could only occasionally climb ladders, ropes and scaffolds.  It was opined that plaintiff had no manipulative, visual, communicative, or environmental limitations.  (Tr. 200-07.)

A CT scan of the lumbar spine taken April 18, 2006, showed no evidence of herniated disc or stenosis.  Mild degenerative changes at L5-S1 were noted.  Also noted was significant atheromatous plaque at the origins of the left and right renal arteries.  (Tr. 708.)

Plaintiff returned to Dr. Rahimi on April 25, 2006, and complained of chronic bilateral hip pain.  Plaintiff reported that

- 33 -

he had experienced such pain intermittently since 2002 and that pain involving the right gluteal area reoccurred six weeks prior without any specific cause. Plaintiff reported that lifting the right leg increased the pain and that taking Aleve decreased the pain. Plaintiff also reported that he was recently started on insulin. Dr. Rahimi noted a CT of the lumbar spine taken April 18, 2006, to reportedly show mild osteoarthritis of the facet joint at L5-S1 as well as mild degenerative disk disease at that level. Musculoskeletal examination showed plaintiff to have a normal gait and to be able to heel and toe stand. Lumbar range of motion was within normal limits. Reflexes could not be obtained from either knee or ankle. Muscle strength of the lower extremities was normal. Straight leg raising was negative. Faber's test was positive on the right. Plaintiff had decreased range of motion about the right hip and tenderness to palpation was noted over the right trochanteric and ischial region. Dr. Rahimi ordered x-rays of the hips. (Tr. 217-18.)

An x-ray taken April 25, 2006, of the right hip showed sclerotic densities within the proximal femur and pelvis. An x-ray of the left hip was within normal limits. (Tr. 227.)

Plaintiff visited Dr. Lawrence A. Kriegshauser on May 2, 2006, for complaints of right hip pain. Plaintiff reported to have experienced intermittent pain since 2002 but that the pain had worsened recently. Plaintiff reported the pain not to currently bother him that much but that he could hardly walk the previous

weekend.[28]  Plaintiff reported taking Aleve for soreness.  Physical examination showed some vague mild tenderness to deep palpation of the right buttock region.  Plaintiff had good range of motion of the right hip.  A little soreness was noted with internal rotation, but nothing very remarkable.  Plaintiff had full range of motion of the right knee and ankle.  No significant tenderness was noted over the greater trochanteric region.  Examination of the left hip and lower extremity was unremarkable.  Straight leg raising was negative bilaterally.  No significant back pain was present.  Dr. Kriegshauser advised plaintiff that there was no evidence of severe arthritis in the right hip as suspected by plaintiff.  In response to plaintiff's complaints that many of his problems have been mis-diagnosed in the past, Dr. Kriegshauser agreed to a bone scan of the right hip.  (Tr. 318-26.)

On May 5, 2006, Dr. Rahimi administered an injection to plaintiff's right hip joint.  (Tr. 223-26.)

An MRI of the right hip taken May 8, 2006, showed changes consistent with advanced avascular necrosis of the right femoral neck with edema in the suberticular surface, and underlying avascular necrosis in the femoral neck and head.  (Tr. 290.)  A bone scan performed that same date showed intense abnormal accumulation of activity about the lateral aspect of the right femoral head corresponding to the area of abnormality observed on the MRI.  (Tr. 291.)

---

[28]In a patient questionnaire completed that same date, plaintiff also reported that he recently experienced shortness of breath, leg swelling, dizzy spells, and arthritis.  (Tr. 324.)

On May 9, 2006, Dr. Kirchner extensively discussed the results of the recent MRI with plaintiff, and specifically the need for pain control and total hip replacement. Duragesic patch[29] was prescribed and plaintiff was instructed to return as needed. (Tr. 702.)

Plaintiff returned to Dr. Kriegshauser on May 15, 2006, who informed him of the recent test results. No bone collapse was noted. Upon consultation, plaintiff decided to undergo core decompression. (Tr. 277.)

Plaintiff underwent arthroscopic debridement of the right hip joint and core decompression of the right femoral head on May 16, 2006. (Tr. 310-11, 314.) Plaintiff was discharged on May 20, 2006, with instructions to continue with aspirin as a prophylaxis to deep vein thrombosis (DVT). (Tr. 314.)

On May 23, 2006, plaintiff telephoned Dr. Kriegshauser and reported increased pain in the left buttock area. Dr. Kriegshauser advised that there was evidence of some avascular necrosis in the left hip, and that shifting his weight to the left side to compensate for his recent surgery on the right hip was aggravating the condition. Plaintiff was instructed to rest and take his pain medication. (Tr. 277.)

Plaintiff returned to Dr. Kriegshauser on May 30, 2006, and reported that he was doing better although he continued to

---

[29]Duragesic patches are used to relieve moderate to severe pain that is expected to last for some time, that does not go away, and that cannot be treated with other pain medications. Medline Plus (last reviewed Feb. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601202.html>.

experience pain in the left hip.  Physical examination of the right hip showed good range of motion and no irritability or guarding. (Tr. 278.)

On June 6, 2006, Dr. Kirchner noted plaintiff's recovery from decompression surgery to be good so far.  (Tr. 704.)

On June 8, 2006, plaintiff reported to Dr. Kriegshauser that he experienced increased pain in the right hip.  Physical examination was consistent with plaintiff's complaints.  An x-ray taken that same date showed evidence of some early flattening of the femoral head.  A total hip replacement was scheduled for the following week.  (Tr. 278.)

On June 14, 2006, plaintiff underwent total right hip replacement.  (Tr. 312-13, 315.)  Plaintiff was discharged on June 19, 2006, with instruction to participate in home physical therapy and home care.  Plaintiff was instructed to continue with aspirin as a prophylaxis to DVT.  A prescription was provided for analgesics.  (Tr. 315.)

Plaintiff visited Dr. Rahimi on July 11, 2006, for trigger point injections to the bilateral trapezius muscles. Plaintiff was diagnosed with bilateral trapezius myofascial pain. Plaintiff was instructed to continue with his other medications and to return in three to four weeks.  (Tr. 813-14, 825-26.)

Plaintiff returned to Dr. Kriegshauser on July 13, 2006, for follow up.  Dr. Kriegshauser noted plaintiff to be doing quite well and to have no pain with motion of the right hip.  Plaintiff reported continued soreness with the left hip and inquired as to

core decompression on that side. Dr. Kriegshauser opined that he was not optimistic about such a procedure, but would nevertheless not undertake any procedure in the immediate future given that plaintiff was currently recovering from total hip replacement. Plaintiff was instructed to return in ten to twelve weeks for follow up. (Tr. 279.)

Plaintiff returned to Dr. Rahimi on August 17, 2006, and complained of increased left cervical and bilateral upper back tenderness associated with doing some work at home. Physical exam-ination showed plaintiff to have reduced cervical range of motion with localized tenderness to palpation along the posterior cervical and bilateral trapezius and rhomboid muscles. Muscle strength was 5/5 in the upper extremities. Trigger point injections were administered to the posterior cervical paraspinous, bilateral trapezius and rhomboid muscles, and plaintiff was instructed to continue with Robaxin[30] as needed. (Tr. 815-17, 827-28.)

On August 23, 2006, Dr. Kirchner completed a Mental Medical Source Statement in which he opined that in the domain of Activities of Daily Living, plaintiff was moderately limited in his ability to cope with normal work stress, function independently, maintain reliability, and accept instructions and respond to criticism. Dr. Kirchner further opined that plaintiff was mildly limited in his ability to behave in an emotionally stable manner,

---

[30]Robaxin is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. Medline Plus (last reviewed Sept. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682579.html>.

relate in social situations, interact with the general public, and maintain socially acceptable behavior. In the domain of Concentration, Persistence or Pace, Dr. Kirchner opined that plaintiff was markedly limited in his ability to complete a normal workday and workweek without interruptions from symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Kirchner further opined that plaintiff was moderately limited in his ability to maintain regular attendance and be punctual, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, respond to changes in work setting, and work in coordination with others. Dr. Kirchner further opined that plaintiff was mildly limited in his ability to make simple work-related decisions and had no limitations in his ability to understand and remember simple instructions. Dr. Kirchner reported that plaintiff had suffered three episodes of decompensation within the previous year which had each lasted two weeks or more. Dr. Kirchner opined that plaintiff suffered these limitations at such severity since February 2006 and that these limitations could be expected to last for twelve continuous months. Dr. Kirchner opined that plaintiff did not have a substantial loss of ability to perform basic mental activities. Dr. Kirchner indicated his diagnoses of plaintiff's mental impairments to be stress adjustment reaction and reactive depression. Dr. Kirchner indicated that he was not qualified to provide a Global Assessment of Functioning score. (Tr. 680-83.)

On September 11, 2006, plaintiff was discharged from physical therapy having achieved most of his goals. It was noted that strength, range of motion, and gait were all within normal limits. (Tr. 293.)

On September 13, 2006, plaintiff reported to Dr. Kirchner that he had obtained good results with rehabilitation. Plaintiff currently complained of dizziness. (Tr. 636.)

Plaintiff visited Dr. Younis on September 25, 2006, with complaints of dizziness. Plaintiff denied any chest pain, discomfort, heaviness, tightness, or syncope. It was noted that plaintiff had been relatively sedentary since his right hip replacement, but that his level of activity was improving. It was noted that plaintiff was scheduled to undergo left hip replacement the following week. Physical examination showed bilateral carotid bruits with preserved carotid upstroke. (Tr. 558-560.) An echocardiogram performed that same date showed abnormal left ventricular systolic function with moderate to severe anterior and inferoseptal hypokinesis; moderate left ventricular enlargement; mild left atrial enlargement; mild left ventricular hypertrophy; moderate mitral and tricuspid regurgitation; mild pulmonic insufficiency; and mild pulmonary hypertension. (Tr. 562.) Dr. Younis instructed plaintiff as to proper medication therapy and advised him to undergo additional physical therapy for the neck and upper chest. Dr. Younis determined for plaintiff to undergo evaluation for possible carotid disease, vertebral arterial disease, or vertebrobasilar insufficiency. (Tr. 558-60.)

A cerebral vascular evaluation conducted at Gateway Cardiology on September 26, 2006, in response to plaintiff's complaints of dizziness and carotid bruit showed evidence of intermediate stenosis involving the right internal carotid artery, and mild to moderate diffuse calcification of the carotid arteries bilaterally. (Tr. 561.) Nuclear imaging studies performed that same date showed fixed, inferoseptal defect with minimal reversibility and moderate inferior hypokinesis. (Tr. 662.) Dr. Younis instructed plaintiff to continue with Diovan and to begin taking Toprol again. (Tr. 663.)

An MRA of plaintiff's neck taken on September 27, 2006, showed about fifty percent stenosis of the ostium of the right vertebral artery, twenty percent stenosis of the right internal carotid artery, and fifteen percent stenosis of the left internal carotid artery. (Tr. 654-55.)

Plaintiff returned to Dr. Kriegshauser on September 27, 2006, who noted plaintiff to be doing extremely well with his right hip with no reports of pain. Plaintiff continued to complain of pain about the left hip and a total left hip replacement was arranged. (Tr. 280.)

Plaintiff visited the VA Hospital on September 29, 2006, and complained of pain. Plaintiff's prescription for Vicodin[31] was refilled. (Tr. 791.)

Plaintiff returned to Dr. Rahimi on September 29, 2006,

_____

[31]Vicodin is used to relieve moderate to severe pain. <u>Medline Plus</u> (last revised Oct. 1, 2008)<<u>http://www.nlm.nih.gov/</u> medlineplus/druginfo/meds/a601006.html>.

and complained of a recent onset of bilateral posterior cervical pain and pain in the upper back region. Trigger point injections were administered to the posterior cervical paraspinous, bilateral trapezius and rhomboid muscles. (Tr. 818-20, 829-30.)

On October 3, 2006, plaintiff underwent total left hip replacement at St. Anthony's Medical Center. Post-operative pathology reports diagnosed the condition as degenerative osteoarthritis. Plaintiff experienced episodes of chest and shoulder pain post-operatively, but the situations resolved. Chest x-rays showed congestive heart failure. Plaintiff also developed symptoms of anemia, which were resolved with one unit of transfused blood. Plaintiff was discharged on October 8, 2006, with instructions to continue with home physical therapy and home care. Plaintiff was instructed to continue with aspirin as a prophylaxis to DVT. A prescription was provided for analgesics. (Tr. 316, 355-549.) Plaintiff's medications upon discharge included Toprol, Protonix, Fragmin,[32] Zocor, Zetia, Quinine, and Plavix. (Tr. 660.)

On October 24, 2006, plaintiff complained to Dr. Kriegshauser of left calf tenderness. A venous Doppler showed chronic type DVT. Dr. Kriegshauser determined to treat the condition with aspirin. After examination, plaintiff was prescribed Flexeril[33] for muscle spasm to try to provide more

---

[32]Fragmin is an anticoagulant use to prevent harmful blood clots from forming. Medline Plus (last reviewed Sept. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696006.html>.

[33]Flexeril is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. Medline Plus (last reviewed Sept. 1, 2008)

comfort with the leg.  (Tr. 280, 288, 658.)

On November 2, 2006, Dr. Kriegshauser noted plaintiff to be doing very well with his left hip with no reports of pain. Plaintiff was given instruction regarding physical therapy and was instructed to return in twelve weeks for follow up.  (Tr. 281.)

On November 2, 2006, Dr. Kriegshauser completed a Physician's Statement for Disabled License Plate in which he stated that plaintiff could not "ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic condition, or other severe disabling condition."  (Tr. 328.)

On November 15, 2006, plaintiff reported to Dr. Kirchner that he was sleeping okay, his appetite was okay, and that his energy was better.  Physical examination was unremarkable. Plaintiff was instructed to continue with his current medications and to return in eight weeks for follow up.  (Tr. 635.)

In a follow up note dated December 7, 2006, Dr. Bassam Al-Joundi noted plaintiff to report having shortness of breath on exercise and significant arthritis limiting his motion and activity.  Physical examination was unremarkable.  Dr. Al-Joundi noted plaintiff's coronary artery disease to be stable and his hypertension to be well controlled.  Dr. Al-Joundi noted that plaintiff's ischemic cardiomyopathy with abnormal left ventricular function would continue to be managed with maximum medical therapy. (Tr. 550-51.)

<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html>.

- 43 -

On December 11, 2006, plaintiff was discharged from physical therapy having done very well with good improvement. It was noted that plaintiff could benefit with progression. (Tr. 294.)

From December 2006 through March 2007, plaintiff continued with an exercise program through the VA Hospital. (Tr. 769-90.) It was noted that plaintiff had been inactive for approximately four years due to pain in his hips, and that he had experienced no pain in his hips, neck or shoulders since recent hip replacement surgery. (Tr. 773.)

On January 8, 2007, plaintiff reported to Dr. Kirchner that he was able to walk pain free. It was noted that plaintiff was taking Coreg instead of Toprol. Physical examination was unremarkable. Plaintiff reported his sleep and appetite to be okay. Plaintiff was instructed to return in ten weeks for follow up. (Tr. 637.)

Plaintiff returned to Dr. Rahimi on January 25, 2007, and complained of a recent reoccurrence of posterior cervical and back pain. Plaintiff reported his trigger point injections from September 2006 to have worked well until recently with the pain beginning to return. Physical examination showed decreased cervical range of motion in all directions with tenderness to palpation over the bilateral posterior cervical, trapezius and rhomboid muscles. Trigger point injections were administered and plaintiff was instructed to follow up for re-evaluation in three to four weeks. (Tr. 821-23, 831-32.)

On February 8, 2007, Dr. Kriegshauser noted plaintiff to be doing very well with both hip replacements. Plaintiff reported that he has had some pain in his right hip after having fallen down an escalator. Physical examination as well as results of x-rays of the hips showed no damage as a result of the fall. Dr. Kriegshauser offered a cortisone injection, but plaintiff stated that he felt the pain was resolving on its own. Dr. Kriegshauser instructed plaintiff to return in October. (Tr. 677.)

On March 20, 2007, plaintiff reported to Dr. Kirchner that he walks outside for forty-five minutes at a medium pace for exercise. Plaintiff reported his sleep, appetite, mood, and energy level to be okay. Dr. Kirchner instructed plaintiff to maintain his current medication regimen but to maintain a better diet. (Tr. 638.)

On March 29, 2007, plaintiff underwent screening for refractive surgery at Pepose Vision Institute. It was noted that plaintiff was "tired of messing w[ith] the [contact lenses] as a scuba diver." Plaintiff underwent surgery in April and May 2007 and recovered well. (Tr. 618-34.)

Plaintiff returned to Dr. Rahimi on May 14, 2007, and complained of reoccurrence of posterior cervical and upper back pain. Plaintiff reported his trigger point injections from January 2007 to have worked well until the recent reoccurrence of pain. It was noted that plaintiff was getting ready for a trip overseas. Physical examination showed somewhat decreased cervical range of motion in all directions with localized tenderness to palpation

over the bilateral posterior cervical, trapezius and rhomboid muscles. Trigger point injections were administered and plaintiff was instructed to follow up for re-evaluation in three to four weeks. (Tr. 824, 833-34.)

The results of a bone densitometry performed on July 3, 2007, were normal. (Tr. 644.)

On July 6, 2007, plaintiff complained to Dr. Kirchner of experiencing two severe charlie horses. It was noted that plaintiff had engaged in a lot of walking during his recent two-week vacation. (Tr. 641.)

Dr. Rahimi administered trigger point injections on July 19, 2007. (Tr. 835-36.)

On August 1, 2007, plaintiff visited the VA Hospital to undergo testing for lung volume/capacity. It was noted that plaintiff experienced dyspnea with walking more than 100 yards. Plaintiff's previous diagnosis of Hodgkin's disease was noted. (Tr. 768.)

An MRI of the cervical spine taken July 24, 2007, showed uncinate process hypertrophy narrowing the neural foramen at C3-C4 on the right. (Tr. 838.)

In an undated Physical Medical Source Statement, Dr. Bassam Al-Joundi opined that plaintiff could sit for one hour in an eight-hour workday, and could stand or walk for fifteen minutes in an eight-hour workday. Dr. Al-Joundi further opined that plaintiff could lift no more than five pounds occasionally, and could carry no more than five to ten pounds occasionally. Dr. Al-Joundi opined

that plaintiff had no manipulative, visual or communicative limitations. Dr. Al-Joundi opined that plaintiff was limited in balancing, and could never reach overhead or stoop. Dr. Al-Joundi opined that plaintiff could never tolerate exposure to odors, dust or noise. Dr. Al-Joundi reported that plaintiff had a medically determinable impairment which could be expected to produce pain, and that he experiences such pain daily for up to thirty minutes; with such pain objectively indicated by muscle spasm and reduced range of motion, and subjectively indicated by plaintiff's complaints of pain. Dr. Al-Joundi opined that plaintiff should use a cane or other assistive device. Dr. Al-Joundi reported that plaintiff's impairments would require him to lie down or take a nap during an eight-hour workday, or to take more than three breaks during an eight-hour workday. Finally, Dr. Al-Joundi opined that plaintiff's limitations have or can be expected to last for twelve continuous months. In response to the query regarding the earliest date from which plaintiff's limitations have existed at the assessed severity, Dr. Al-Joundi responded, "12 months or more." (Tr. 553-56.)

### IV. The ALJ's Decision

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on May 1, 2003, and continued to meet them through the date of the decision. The ALJ found plaintiff not to have engaged in substantial gainful activity since May 1, 2003. The ALJ found plaintiff's coronary artery disease and history of avascular necrosis of the hips to be severe

impairments, but that such impairments did not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's allegations not to be fully credible. The ALJ found that for the period of May 1, 2003, to February 28, 2006, plaintiff had the residual functional capacity (RFC) to lift or carry fifty pounds occasionally and twenty-five pounds frequently; to sit six hours in an eight-hour workday and stand and/or walk a total of six hours in an eight-hour workday; and to occasionally climb stairs or ramps. The ALJ found plaintiff unable to climb ladders, ropes or scaffolds; to push or pull objects with his legs on a repetitive basis; and had to avoid concentrated exposure to unprotected heights. With such RFC, the ALJ determined plaintiff able to perform his past relevant work as a building contractor and thus not to be disabled during this period. The ALJ further found that since March 1, 2006, plaintiff's RFC had been reduced such that plaintiff could not lift or carry more than twenty pounds occasionally and ten pounds frequently; and could sit for a total of four hours in an eight-hour workday and stand and/or walk for a total of ninety minutes in an eight-hour workday with assistance from a cane required. The ALJ also found that, since March 1, 2006, plaintiff was unable to stoop and would require more than three breaks each workday. With such RFC, the ALJ determined plaintiff not able to perform any of his past relevant work since March 1, 2006. Considering plaintiff's vocational factors as well, the ALJ found plaintiff not able to perform any other work in the national economy since March

1, 2006, and thus to be under a disability since that time.  (Tr. 22-23.)

## V.  Discussion

        To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

        To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of

impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether the claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If the claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and

consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically, that the ALJ failed to follow the applicable Social Security Ruling (SSR) in determining the onset date of plaintiff's disability. Plaintiff also contends that the ALJ erred by failing to provide an adequately supported narrative RFC assessment for the period from May 1, 2003, to February 28, 2006. Plaintiff also claims that the

ALJ failed to consider and thus properly analyze plaintiff's mental impairments.  Finally, plaintiff argues that the ALJ failed to address the conflict between the vocational expert's testimony and the Dictionary of Occupational Titles regarding plaintiff's past relevant work as a building contractor.  The undersigned will address each of plaintiff's contentions in turn.

A.    Determination of Onset Date

In this cause, the ALJ determined plaintiff to be disabled beginning March 1, 2006, but not before.  Plaintiff argues that the ALJ erred by not obtaining the opinion of a medical advisor as required under Social Security Ruling 83-20 to determine the onset of disability inasmuch as the medical evidence shows his hip pain to have begun before March 1, 2006.

Social Security Ruling 83-20 governs the determination of disability onset dates and is binding on the Commissioner, including the decisions of an ALJ.  See Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984) (noting that, although Social Security Rulings do not have the force of law, they are binding on "all components of the Social Security Administration."); Grebenick v. Chater, 121 F.3d 1193, 1200-01 (8th Cir. 1997); 20 C.F.R. § 402.35(b)(1).   An ALJ, therefore, must follow SSR 83-20's procedures to determine the onset date of a claimant's disability.

Social Security Ruling 83-20 distinguishes between disabilities of traumatic origin and those of non-traumatic origin. For disabilities of a traumatic origin, the Ruling states that "onset is the day of the injury if the individual is thereafter

expected to die as a result or is expected to be unable to engage in substantial gainful activity . . . for a continuous period of at least twelve months." SSR 83-20, 1983 WL 31249, at *2. Determination for an onset of disabilities of non-traumatic origin is more complicated. The Ruling states that, for non-traumatic disabilities, "the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity. The weight to be given any of the relevant evidence depends on the individual case." Id.

> [T]he date alleged by the individual should be used it if is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record.

Id., at *3.

"Convincing rationale must be given for the [onset] date selected." Id.

With respect to the ALJ's failure to obtain the opinion of a medical advisor in this cause, plaintiff challenges only the ALJ's determination that his hip pain was not of disabling severity prior to March 1, 2006. Plaintiff's impairment of avascular necrosis of the hip, found by the ALJ to be severe, is of non-traumatic origin and is degenerative in nature. As such, in determining the date of onset, the ALJ was required under SSR 83-20

to consider the plaintiff's allegations, work history, and the medical and other evidence concerning the severity of his impairment. SSR 83-20; see also Karlix v. Barnhart, 457 F.3d 742, 747 (8th Cir. 2006). With respect to the third prong, that is, medical evidence, the Ruling recognizes the difficulty in obtaining evidence establishing the precise date upon which a slowly progressive impairment becomes disabling. The Ruling thus permits the ALJ "to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." SSR 83-20, 1983 WL 31249, at *2. Such inference, however, must be made on an informed judgment of the facts in the particular case; and such judgment "must have a legitimate medical basis." Id., at *3. Accordingly, to insure that the inferred onset date is based upon a legitimate medical basis, SSR 83-20 encourages the ALJ, at the hearing, to obtain an expert opinion from a medical advisor as to a medically reasonable date of onset. Id.; Karlix, 457 F.3d at 747; Grebenick, 121 F.3d at 1201. The assistance of a medical advisor is *required*, however, only in circumstances where the medical evidence of onset is ambiguous. Grebenick, 121 F.3d at 1201 (citing Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995)). Accordingly, the question presented on the plaintiff's claim here is whether the medical evidence of onset with respect to plaintiff's disabling hip pain is ambiguous. For the following reasons, it is not.

In his written decision, the ALJ thoroughly summarized the medical evidence of record relating to plaintiff's hip

impairment and the treatment rendered therefor. Despite plaintiff's claim that he has suffered hip pain since 2002, the ALJ properly noted the record to show plaintiff not to have complained of hip pain until 2004. The medical evidence of record shows plaintiff's first report of hip pain to have been made to Dr. Kirchner in January 2004. Upon his continued complaints in June 2004, plaintiff was referred to pain management specialist Dr. Rahimi who treated plaintiff with injection therapy and physical therapy for the condition. With such treatment, plaintiff's pain improved. Indeed, within one month of initiating treatment, plaintiff reported his pain to have significantly improved and, in August 2004, plaintiff reported having no pain in his left hip and that the pain in his right hip was minimal. Throughout the remainder of 2004, plaintiff continued with injection therapy and enjoyed positive results, continually reporting that his hips were doing well. "Impairments that are controllable or amenable to treatment do not support a finding of total disability." <u>Hutton v. Apfel</u>, 175 F.3d 651, 655 (8th Cir. 1999). After an additional report of positive results in December 2004, the medical record is silent with respect to any complaints of hip pain until April 2006 when plaintiff complained that the pain had reoccurred six weeks prior, that is, in early March 2006. Further examination and diagnostic testing showed avascular necrosis. After unsuccessful compression surgery on the right, plaintiff underwent successful total hip replacement bilaterally. Accordingly, the medical evidence does not support a finding that the onset of disability

relating to plaintiff's hip pain occurred prior to March 1, 2006.

In addition to the medical evidence demonstrating the lack of a disabling hip condition prior to March 2006, "other evidence" of the impairment's severity further bolsters the ALJ's determination that such condition was not disabling prior to March 1, 2006. As noted by the ALJ, the plaintiff maintained a lifestyle during this period inconsistent with a finding of disability. Indeed, a review of the record shows that, prior to March 1, 2006, when plaintiff claims his painful hip impairment rendered him disabled, plaintiff was nevertheless able to engage in the following activities:

| | | |
|---|---|---|
| February 2002 | -- | planning significant activity, including a trip to Tahiti for scuba diving |
| June 2002 | -- | planning a trip for scuba diving |
| June 2003 | -- | advised by cardiologist to allow two months before resuming scuba diving activity |
| August 2004 | -- | recently returned from scuba diving trip |
| September 2004 | -- | no difficulty trimming bushes |
| October 2004 | -- | instructed by physician to call upon return from vacation |
| December 2004 | -- | working in the yard |
| January 2005 | -- | underwent testing for sports clearance |
| April 2005 | -- | letter from Dr. Knight describing plaintiff as a "very active man" |
| May 2005 | -- | appeared for follow up appointment earlier than planned inasmuch as he was leaving for two-week vacation |

| July 2005 | -- | leaving soon to go on a diving trip |
| September 2005 | -- | remodeling kitchen |
| September 2005 | -- | report that plaintiff tolerated diving trip to Belize without difficulty |
| November 2005 | -- | remodeling kitchen |
| January 2006 | -- | finished remodeling kitchen |
| January 2006 | -- | trip to South America planned over the next few weeks |

Given plaintiff's lack of credibility regarding the level to which he suffered debilitating hip pain prior to March 1, 2006[34]; the unambiguous medical evidence demonstrating the lack of debilitating hip pain experienced by plaintiff prior to March 1, 2006; and the lack of any other evidence other than plaintiff's unsupported claims suggesting an onset date earlier than March 1, 2006,[35] the evidence was unambiguous as to the onset date of

_____

[34]Although plaintiff does not challenge the ALJ's credibility determination here, a review of the ALJ's decision nevertheless shows that, in a manner consistent with and as required by Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ thoroughly considered the subjective allegations of plaintiff's disabling pain on the basis of the entire record before him and set out inconsistencies detracting from the credibility of such allegations. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

[35]To the extent plaintiff argues that Dr. Kriegshauser's and the VA Hospital's records report plaintiff to have suffered from hip pain since 2002, the undersigned notes that such reports were based only on plaintiff's statements. An ALJ does not err in determining not to rely on a physician's impressions that are based largely on a claimant's subjective complaints without objective

plaintiff's disabling condition, and thus the ALJ did not err in failing to obtain the opinion of a medical advisor on the matter. Karlix, 457 F.3d at 747.

A review of the ALJ's decision shows him to have considered plaintiff's allegations of disability, work history, and the medical and other evidence concerning the severity of his hip impairment and to have properly inferred the onset date of plaintiff's disability from the facts in this particular case, with legitimate medical bases to support his judgment. Because the evidence demonstrating the onset date of plaintiff's disability was not ambiguous, the ALJ was not required to obtain the opinion of a medical advisor to assist him in making this determination. Substantial evidence supports the ALJ's decision that plaintiff was not disabled due to hip pain prior to March 1, 2006. As such, this determination is not subject to reversal. McClanahan v. Commissioner of Soc. Sec., 474 F.3d 830, 839-40 (6th Cir. 2006).

B.   Mental Impairment

Plaintiff claims that the ALJ erred by failing to consider evidence of plaintiff's mental impairment, including the opinion of plaintiff's treating physician regarding plaintiff's

---

medical support.   See Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005).   See also Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) ("A claimant's complaints of pain or symptoms shall not alone be conclusive evidence of disability[.]"); Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (ALJ may disregard portions of medical report that are based on claimant's subjective descriptions of pain level, found by ALJ not to be credible); Gaddis v. Chater, 76 F.3d 893, 895-96 (8th Cir. 1996) (ALJ may discount physician's opinion that is based on discredited subjective complaints).

limitations caused thereby; and by failing to undergo the required analysis under 20 C.F.R. § 404.1520a regarding plaintiff's mental impairment.

Plaintiff did not allege a mental impairment in his application, nor did he testify to a mental impairment at the hearing before the ALJ. In addition, a review of the voluminous treatment record shows only a diagnosis of reactive depression by plaintiff's primary care physician, with such diagnosed condition considered by the same physician to be in remission one month after the initial diagnosis. Anti-anxiety medication was prescribed during this brief period and not thereafter.[36] Because such scant evidence of a mental impairment fails to put an ALJ on notice that such impairment is claimed to be disabling, an ALJ's failure to undergo analysis in determining the severity of an alleged mental impairment in such circumstances is not error. See Kitts v. Apfel, 204 F.3d 785 (8th Cir. 2000) (per curiam) (citing Sullins v. Shalala, 25 F.3d 601, 605 (8th Cir. 2000)).

C.    Narrative RFC Assessment

Plaintiff claims that the ALJ erred by failing to provide a narrative assessment of plaintiff's RFC for the period from May

---

[36]To the extent this same physician completed a Mental Medical Source Statement five months later indicating the debilitating nature of plaintiff's mental impairment, such Statement does nothing to alter the medical evidence of record which shows that plaintiff was diagnosed with and successfully treated for depression for only one month. Indeed, in his Statement, Dr. Kirchner did not provide any objective support for his opinion regarding plaintiff's mental limitations and further, such opinions are inconsistent with his own findings and observations made during his treatment of plaintiff.

1, 2003, to February 28, 2006, during which the ALJ determined plaintiff to have the RFC to perform work. For the following reasons, plaintiff's claim is without merit.

A claimant's RFC is what he can do despite his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The claimant has the burden to establish his RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a). A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination. Eichelberger, 390 F.3d at 591; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id.

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily

activities, observations).  In assessing RFC,
the adjudicator must discuss the individual's
ability to perform sustained work activities
in an ordinary work setting on a regular and
continuing basis (i.e., 8 hours a day, for 5
days a week, or an equivalent work schedule),
and describe the maximum amount of each work-
related activity the individual can perform
based on the evidence available in the case
record.  The adjudicator must also explain how
any material inconsistencies or ambiguities in
the evidence in the case record were
considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (footnote omitted).

A review of the ALJ's decision and the relevant evidence
of record shows the ALJ to have engaged in the proper analysis as
to plaintiff's RFC as it existed prior to March 1, 2006.  Some
medical evidence supports the ALJ's determination, and for the
following reasons, such determination is supported by substantial
evidence on the record as a whole.

First, with respect to the medical evidence, the ALJ
noted plaintiff's hypertension to be largely controlled by
medication; that plaintiff retained normal upper extremity strength
and sensory ability despite neck and shoulder myofascial disorder;
that plaintiff maintained good cervical and shoulder range of
motion; that trigger point injections were effective; that
plaintiff did not lack the ability to ambulate effectively for at
least twelve months; that subsequent to plaintiff's coronary bypass
surgery and prior to March 2006, plaintiff's coronary artery
disease was considered to be stable, yielding essentially normal
results from electrocardiograms and echocardiograms; that plaintiff
appeared to be asymptomatic from a cardiac standpoint in May 2005;

that plaintiff demonstrated good exercise tolerance in January 2006 and was continually encouraged by his physicians to exercise; that the medical record was virtually silent with respect to plaintiff's hip condition until 2006, except for a limited period in 2004 wherein plaintiff's hip pain was essentially controlled (see also discussion, supra at Section V.A); and that plaintiff's bilateral hip pain reoccurred in March 2006 with subsequent testing and examination showing avascular necrosis ultimately requiring total hip replacement in June and October 2006.

The ALJ also discussed the nonmedical evidence of record, noting specifically that plaintiff engaged in an active lifestyle prior to March 2006 which included a scuba diving trip to Belize in mid-July 2005 with no difficulty, remodeling his kitchen in late 2005 or early 2006, and taking a trip to South America in early 2006. The ALJ also noted that, in April 2005, one of plaintiff's treating physicians described plaintiff as being "a very active man."

Finally, the ALJ discussed the opinions of plaintiff's treating physicians regarding plaintiff's physical ability to engage in work-related activities, and accorded such opinions appropriate weight upon review of their consistency with the evidence contained in the record as a whole.

Upon conclusion of his discussion of specific medical facts, nonmedical evidence, and the consistency of such evidence when viewed in light of the record as a whole, the ALJ assessed plaintiff's RFC and specifically set out the maximum amount of each

work-related activity plaintiff could perform prior to March 1, 2006, based on the evidence available in the case record. Because some medical evidence supports this determination, the ALJ's RFC assessment must stand. See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008).

In addition, the undersigned notes that the ALJ's RFC assessment appears to be consistent with the findings of medical consultant Blattel in her RFC Assessment completed in April 2006 upon her review of the medical evidence of record. Although this assessment from a non-treating medical source cannot alone constitute substantial evidence if it conflicts with the assessment of a treating physician, Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999), medical consultant Blattel's opinion does not stand alone in this case. Indeed, as set out above, the ALJ weighed all the relevant medical and other evidence of record in determining plaintiff's ability to perform work-related activity. "'It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment.'" Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (quoting Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004)).

Upon engaging in a thorough discussion of all the relevant evidence relating to plaintiff's ability to perform work-related activities, the ALJ made explicit findings as to plaintiff's RFC as he determined it to exist prior to March 1, 2006. The ALJ did not err in this process of determining

- 63 -

plaintiff's RFC and the plaintiff's claim that this matter must be remanded for an ALJ to engage in a more thorough process should be denied.  See Depover v. Barnhart, 349 F.3d 563, 567-68 (8th Cir. 2003).

D.   Vocational Expert Testimony

Plaintiff claims that the ALJ erred in relying on vocational expert testimony in determining plaintiff able to perform his past relevant work as a building contractor inasmuch as the ALJ failed to question the vocational expert as to whether his opinion regarding the exertional level of plaintiff's past work conflicted with information contained in the Dictionary of Occupational Titles (DOT).  Plaintiff also argues that the ALJ erred in relying on this vocational expert testimony to find plaintiff able to perform such past relevant work inasmuch as this finding focused only on the least exertional aspect of plaintiff's past work and failed to consider the full panoply of such work.

As an initial matter, the ALJ's failure to question the vocational expert as to whether his opinion regarding the job of building contractor was in conflict with information contained in the DOT constituted nothing more than harmless error.  The vocational expert testified that work as a building contractor was "light" and "skilled."  Section 182.167-010 of the DOT describes the occupation of contractor in the construction industry as "light" and "skilled."  As such, there exists no conflict between the vocational expert's testimony and the DOT.  Where there exists no conflict, procedural error in failing to question the vocational

expert regarding the DOT is harmless.  <u>Renfrow v. Astrue</u>, 496 F.3d 918 (8th Cir. 2007).  As discussed below, however, the ALJ's reliance on the vocational expert's testimony in determining plaintiff able to perform his past relevant work was reversible error.

At the administrative hearing on August 28, 2007, the ALJ posed a hypothetical question to the vocational expert which set out plaintiff's RFC prior to March 1, 2006, as ultimately determined by the ALJ. (<u>See</u> <u>supra</u> at pp. 5-6.)  Upon conclusion of the recitation of this first hypothetical, the ALJ and the vocational expert engaged in the following exchange:

> Q [ALJ] . . . Given those restrictions and those alone, could this hypothetical claimant return to any past relevant work?
>
> A [VE]  Yes.
>
> Q    And what would that be?
>
> A    The, does the contract administrator fall in with an acceptable –
>
> Q    No, it's about a year short.
>
> A    Oh, okay.  I'm sorry.
>
> Q    So that's a no then?
>
> A    Yeah, that's a no.  The building contractor reported part of his construction contact with the job.  It is light, skilled.
>
> Q    So now you're telling me with that he can go back to that job?
>
> A    Only as a building contractor, not as a contractor and a worker in construction.
>
> Q    Okay.  And, and if he were to use that as another job, he obviously would have

transferable skills to that job, would he not?

A      Yes.

Q      So as an alternative he would have transferable skills to light work as a building contractor?

A      Right.  Light and skilled.

(Tr. 44.)

In his written decision, the ALJ determined that prior to March 1, 2006, plaintiff retained the RFC to perform a wide range of medium work.  With this RFC, the ALJ determined plaintiff able to perform his past relevant work finding, specifically, that "the vocational expert[] testified that an individual with the pre-March 2006 capacity could perform the claimant's past relevant work as a building contractor if it is performed as customarily performed in the national economy."  (Tr. 21.)  As set out above, however, the vocational expert did not testify that plaintiff could perform his past relevant work, and indeed specifically testified that he could not.  Although the vocational expert testified that plaintiff could perform that part of the job which entailed work as a building contractor, the expert nevertheless testified that plaintiff could not perform the job to the extent such work was combined with construction.  There is no dispute that plaintiff's past relevant work was such combined work and was performed at the "heavy" level of exertion.

"Every occupation consists of a myriad of tasks, each involving different degrees of physical exertion.  To classify an applicant's 'past relevant work' according to the least demanding

function of the claimant's past occupations is contrary to the letter and spirit of the Social Security Act." <u>Valencia v. Heckler</u>, 751 F.2d 1082, 1086 (9th Cir. 1985); <u>see also</u> <u>Carmickle v. Commissioner, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1166 (9th Cir. 2008); <u>Bechtold v. Massanari</u>, 152 F. Supp. 2d 1340, 1346 (M.D. Fla. 2001). This is precisely what the ALJ did here. By incorrectly characterizing plaintiff's past relevant work in order to conclude at Step 4 of the sequential evaluation process that the plaintiff could perform past work as a building contractor was an error of law. Although the evidence obtained from the vocational expert may support the conclusion that the job of building contractor constitutes other work in the national economy that plaintiff could perform, the ALJ made no finding on the issue. This matter must therefore be remanded to the Commissioner for specific findings as to whether, prior to March 1, 2006, plaintiff could perform other work as it existed in the national economy, including work as a building contractor existing in significant numbers at the "light" and "skilled" level. Inasmuch as plaintiff's RFC for this period was properly determinated, the Commissioner shall not revisit that issue.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this cause is **REMANDED** to the Commissioner for the limited purpose of determining whether plaintiff could perform other work as it existed in significant numbers in the national economy prior to March 1, 2006, with the

RFC as properly determined by the Commissioner in the instant cause.

Judgment shall be entered accordingly.


_____
UNITED STATES MAGISTRATE JUDGE


Dated this  _25th_  day of March, 2009.